IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 29, 2014

**STATE OF TENNESSEE v. JONATHAN MICHAEL BROWN**

**Appeal from the Criminal Court for Monroe County**
**No. 11-363      Carroll L. Ross, Judge**

———————————————

**No. E2013-00570-CCA-R3-CD - Filed March 6, 2014**

———————————————

A Monroe County Criminal Court jury convicted the defendant, Jonathan Michael Brown, of facilitation of second degree murder and being an accessory after the fact to second degree murder, and the trial court imposed an effective sentence of eight years to be served in confinement.  In this appeal, the defendant challenges the trial court's denial of his pretrial motion to dismiss based upon the loss or destruction of evidence, the sufficiency of the convicting evidence, and the denial of alternative sentencing.  Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, JJ., joined.

Jeanne L. Wiggins, Assistant District Public Defender, for the appellant, Jonathan Michael Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; R. Steven Bebb, District Attorney General; and James H. Stutts, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant's convictions in this case relate to his role in the March 4, 2009 murder of the victim, Renee Miller, which was perpetrated by the defendant's friend, Erick Waldrop.

At trial, Jeff Vittatoe, Deputy Director of the 9th Judicial District Drug Task

Force and Lieutenant Investigator for the Loudon County Sheriff's Office, testified that he was a friend of the Miller family and that the victim's husband, Jamie Miller, telephoned him asking for assistance locating the victim. Agent Vittatoe said that the victim's husband, who worked in Alaska, told him that the victim had failed to return home and that her absence was highly unusual. Agent Vittatoe recalled that Mr. Miller told him that the victim was last seen in the company of their daughter's boyfriend, Erick Waldrop. After speaking with Mr. Miller, Agent Vittatoe telephoned the Miller's daughter, Joanny Miller, and asked that she and her boyfriend meet him at the Walmart in Madisonville. Because that location was outside his jurisdiction, Agent Vittatoe enlisted the participation of Monroe County Sheriff's Department Detective Mike Morgan.

At the Walmart, Agent Vittatoe then provided Mr. Waldrop with *Miranda* warnings and questioned him about the victim's disappearance. As a result of his conversation with Mr. Waldrop, Agent Vittatoe "was able to determine that . . . she was deceased, and that [Agent Vittatoe] could find her in a, in another county in a vehicle." Agent Vittatoe testified that Mr. Waldrop related to him "the events that . . . [led] to her demise" and agreed to accompany the Agent "to a location in McMinn County just off Mecca Pike." At that location, which was "just a couple hundred yards out Mecca Pike" from Etowah, officers discovered the victim's car abandoned several hundred yards down "a forest service access type road." The victim lay inside the car, and it was immediately apparent to Agent Vittatoe that Ms. Miller was deceased and that there had been "some violence and blood involved." At that point, Agent Vittatoe's involvement in the case ended, and he went to the Miller residence to telephone Mr. Miller and take responsibility of the Millers' other children.

Monroe County Sheriff's Department Detective Douglas W. Brannon testified that he accompanied Detective Morgan to the location of Ms. Miller's vehicle on March 4, 2009. Detective Brannon recalled that the window of the vehicle was broken, and broken glass lay inside the car. During the course of his investigation, Detective Brannon learned that the window had been broken by "[a] projectile fired from a gun, knocking the glass out." That gun, he learned, had been fired by Mr. Waldrop. Detective Brannon said that the victim's body was wrapped in jackets and lying on the passenger's side of the car. Based on his observations, Detective Brannon concluded that Ms. Miller had been the victim of a violent crime and that the crime had not occurred at that location. The murder weapon, a handgun, was discovered in Joanny Miller's vehicle.

Based on other information obtained during the investigation, Detective Brannon focused on the defendant as a person of interest. While at the defendant's residence several days after the discovery of the victim's body, Detective Brannon observed a concrete slab upon which sat "a pile of burnt debris." Among the debris, officers found what

"appeared to be a red handbag." He said that officers had been informed "that Ms. Miller favored red, and in fact, her red handbag had not been recovered." During his conversations with the defendant, Detective Brannon learned that the defendant and Mr. Waldrop "were acquainted fairly closely" and that the defendant had had contact with Mr. Waldrop on the day of the offense. Upon questioning, the defendant admitted to police that he knew that Mr. Waldrop had burned the victim's handbag and its contents and that he was present when the burning occurred.

During cross-examination, Detective Brannon acknowledged that no physical evidence connected the defendant to the victim's vehicle. He conceded that no effort had been made to clean up or dispose of any items from the burn pile and that the defendant claimed he did not know why Mr. Waldrop had burned the items. Detective Brannon acknowledged that the murder weapon had been found in Joanny Miller's car inside a trash bag and that Joanny Miller had refused to provide a statement to police.

Monroe County Criminal Court records admitted during the trial showed that on September 20, 2010, Mr. Waldrop pleaded guilty to second degree murder for the killing of the victim.

Tennessee Bureau of Investigation Agent David Guy testified that he became involved in the case at the request of the Monroe County Sheriff's Office. During the course of the investigation, Agent Guy obtained two sworn statements from the defendant. Initially, the defendant denied any knowledge of Mr. Waldrop's having murdered the victim, claiming instead that he had merely provided Mr. Waldrop a ride without having any knowledge of Mr. Waldrop's plans. The defendant said that Mr. Waldrop telephoned him on the day before the murder and asked the defendant to pick him up at 10:00 a.m. the next morning. The defendant agreed, and he retrieved Mr. Waldrop from Mr. Waldrop's house at the appointed time. According to the defendant, he dropped Mr. Waldrop off at a church in Madisonville approximately 20 minutes later. Then, at 1:15 p.m., Mr. Waldrop telephoned the defendant and asked the defendant to pick him up near the forest service station in Etowah. The defendant complied, and when he arrived at the appointed location "right across the train tracks . . . across the bridge . . . on a side road . . . right next to the main road," he saw Mr. Waldrop holding a red handbag. The defendant said that he then drove Mr. Waldrop to three different banks, where Mr. Waldrop tried unsuccessfully to cash a check for $1,200.00 written on the victim's account that Mr. Waldrop claimed had been given to him in exchange for work performed at the Miller residence. Mr. Waldrop, whom the defendant described as "extra fidgety," then asked the defendant to drive him to the defendant's residence. The defendant told Agent Guy that while he was inside the house talking on the telephone to his girlfriend, Mr. Waldrop got a container of lighter fluid from the top of the refrigerator and then went outside to a concrete patio, where Mr. Waldrop burned the red handbag. The

defendant said that at approximately 5:00 p.m., Joanny Miller sent a text message to Mr. Waldrop letting the men know that she was waiting for Mr. Waldrop at "the Athens exit." The defendant told officers that he drove Mr. Waldrop to the Mt. Verde interstate exit and that Mr. Waldrop got into a car with Joanny Miller. The defendant insisted that he did not see the victim or her car that day.

From that point forward, the defendant's story began to unravel. After initially denying any knowledge that Mr. Waldrop had had contact with the victim on March 4, 2009, the defendant admitted that Mr. Waldrop had told him later that day, "'I went and talked with Joanny's mom and it didn't go well.'" The defendant asked the officers what would happen if he admitted that he "knew that [Mr. Waldrop] had talked about killing somebody prior to this." The defendant asked, "If I knew that he was going somewhere that day possibly to kill someone, whether I believed it or not, because I really didn't believe it, and tell you about it, am I gonna be in any trouble?" The defendant then claimed that Mr. Waldrop fantasized about being a "hitman" and that he often told the defendant about "doing a job." The defendant maintained that he did not believe Mr. Waldrop's claims regarding the murders he had allegedly committed or those he intended to commit. He did acknowledge, however, that when Mr. Waldrop asked him for a ride on March 4, 2009, he told the defendant that he planned to "do a job."

Upon further questioning, the defendant admitted to police that Mr. Waldrop had telephoned him several days before the March 4, 2009 murder and asked the defendant to provide him a ride so that Mr. Waldrop could "do a job." The defendant said that Mr. Waldrop agreed to pay him $1,000 for his services, explaining to the defendant that Mr. Waldrop himself would receive $3,000 for committing the murder. The defendant said that although he agreed to participate and that the money was his primary motivation, he did not truly believe that Mr. Waldrop would kill anyone. The defendant picked Mr. Waldrop up from Mr. Waldrop's house, and Mr. Waldrop, who was armed with a handgun, expressed that he had been "jacked up" for the day's events. The defendant told officers that he played a particular song on the radio and told Mr. Waldrop that the song was good "murder music." The defendant admitted, "I wondered if [Mr. Waldrop] wasn't gonna go kill Joanny's mom" because Mr. Waldrop had "talked about it before. . . . He had joked about it . . . 'I hate that b[****]. Me and her don't get along anyway. One of these days I'll probably end up killing her.'"

The defendant dropped Mr. Waldrop off at a church in Madisonville, and Mr. Waldrop telephoned the defendant three hours later and asked the defendant to pick him up at "'the old ranger station'" in Etowah. The defendant did as Mr. Waldrop asked, and when Mr. Waldrop got into the defendant's car, he reported to the defendant that he had been with the victim and that their meeting "did not go well." He said that Mr. Waldrop told him that

he had given the victim two choices and that she had chosen incorrectly, so Mr. Waldrop had shot her and then disposed of her body by dumping the car. The defendant recalled that Mr. Waldrop was carrying a red handbag. The men then drove to three different banks, where Mr. Waldrop attempted to negotiate two checks drawn on the victim's account, one made out to Mr. Waldrop for $1,200.00 and one made out to Joanny Miller for $1,500.00. When their efforts were unsuccessful, they returned to the defendant's house, where the defendant gave Mr. Waldrop some lighter fluid so that Mr. Waldrop could burn the red bag. The defendant also told officers that he had seen Mr. Waldrop attempting to forge the victim's signature on checks that he had taken from the red handbag.

During cross-examination, Detective Brannon acknowledged that the defendant's two interviews were the longest of those conducted by police in this case. Interviews with Mr. Waldrop and Joanny Miller were significantly shorter. Detective Brannon also acknowledged that the murder weapon was discovered in Joanny Miller's car and that some of Mr. Waldrop's clothing was discovered in the clothes dryer at the Miller home.

Following this testimony, the State rested. After a full *Momon* colloquy, the defendant elected to testify.

The 28-year-old defendant testified that he did not know the victim and that, although he had seen Joanny Miller "in passing," he did not really know her. The defendant said that he met Mr. Waldrop at church, and the two became friends. The defendant recalled that Mr. Waldrop came to his house on a Sunday and asked if the defendant "would pick him up and drop him off" in exchange for $1,000. The defendant insisted that he did not take Mr. Waldrop seriously. He said that when he picked Mr. Waldrop up on Wednesday morning, Mr. Waldrop was armed with a gun, but the defendant dismissed that as "nothing unusual" and "just part of the upbringing in Tennessee." The defendant denied that Mr. Waldrop told him that he intended to kill someone or that he had been excited to do it. The defendant also denied that Mr. Waldrop told him later that day that Mr. Waldrop had, in fact, shot someone.

The defendant claimed that Mr. Waldrop "had this fantasy that he was some kind of hired hit man." The defendant said that he believed that Mr. Waldrop's statements about murder "were just more of his fantasy statements" and that "his emotional reaction that day was because that [Mr. Waldrop and Joanny Miller] had went and got an abortion." The defendant admitted that he saw Mr. Waldrop with two checks that day, "a $1200.00 check made out to Erick and a $1500.00 check made out to Joanny." He said that Mr. Waldrop had the red handbag when the defendant picked him up and that when they got to the defendant's house, Mr. Waldrop went outside and started a fire to burn the handbag "unbeknownst" to the defendant. The defendant claimed that he "was very intimidated and scared" when

interviewed by the officers and that it was this intimidation and their refusal to believe him that prompted him to add fabricated details to his statement. He maintained that despite telling the officers otherwise, he did not know about the murder until the following day when his father telephoned him and told him that Mr. Waldrop had been arrested for murder.

During cross-examination, the defendant maintained that if Mr. Waldrop told police that the defendant burned the victim's purse, "it was a lie." He said that he was not concerned when Mr. Waldrop got into his car with a gun because Mr. Waldrop "always carried his gun with him." The defendant said that although he told police that he had only picked Mr. Waldrop up and dropped him off one other time, there were many times that he had done so, specifically so that Mr. Waldrop could rendevous with Joanny Miller. The defendant insisted that he was lying in his statement to police because he "was scared" and because he "wanted to do everything [he] could to help them." He claimed that, contrary to his statement, he did not know that Mr. Waldrop planned to murder anyone and that he did not know until his father told him of Mr. Waldrop's arrest on the following day that Mr. Waldrop had actually committed a murder. He did concede, however, that getting the $1,000 was his motivation for providing Mr. Waldrop with transportation on the day of the murder.

James Farr, a dairy farmer who employed the defendant's father, testified that he had seen Mr. Waldrop burning something at the defendant's residence. He said that he saw the defendant inside the house talking on the telephone while Mr. Waldrop tended the fire.

Based upon this evidence, the jury convicted the defendant, who was originally charged with second degree murder under a theory of criminal responsibility, of the lesser included offense of facilitation of second degree murder and of the charged offense of being an accessory after the fact to second degree murder. Following a sentencing hearing, the trial court imposed an eight-year sentence to be served in confinement.

In this appeal, the defendant contends, citing *State v. Ferguson*, 2 S.W.3d 912 (1999), that the trial court erred by refusing to dismiss the charges based upon the State's loss or destruction of evidence, that the evidence was insufficient to support his convictions, and that the trial court erred by ordering a fully incarcerative sentence. We consider each claim in turn.

*I. State v. Ferguson*

The defendant contends that the trial court should have dismissed the charges against him based upon the State's failure to preserve the audio recordings of two telephone calls that Mr. Waldrop made to the defendant while Mr. Waldrop was incarcerated at the

Monroe County Jail.  The State asserts that the trial court properly denied the defendant's motion because the defendant failed to prove his *Ferguson* claim.  We agree with the State.

In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial."  *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-16 (1999)).  The court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution," *Merriman*, 410 S.W.3d at 784 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), and rejected the "bad faith" analysis espoused by the United States Supreme Court in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785.  The supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.*  The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918).  "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*, 2 S.W.3d at 917).  If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

> "(1) [t]he degree of negligence involved;
> (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> (3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917).  "If the trial court

concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

In this case, the defendant filed a pretrial motion to dismiss, claiming that the State had failed in its duty to preserve the audio recordings of telephone calls made to the defendant by Mr. Waldrop while Mr. Waldrop was incarcerated in the Monroe County Jail and that a fundamentally fair trial could not be had in the absence of the recordings. At the hearing on the defendant's motion, Agent Guy testified that during the March 9, 2009 interview, the defendant told officers that he had a telephone conversation with Mr. Waldrop that took place after Mr. Waldrop's incarceration. Agent Guy said that he did not, at that point, make any decision with regard to "pulling" the recording of the telephone conversation from the jail's recording system because he "did not have the ability to pull that . . . it being on a system that is within the bounds and the curtilage of the sheriff's department." Agent Guy said that he "was told by Captain Morgan that he would take care of getting any phone calls that was made over the jail phone." Agent Guy testified that he participated in "[n]umerous" conversations with Mr. Waldrop beginning with Mr. Waldrop's arrest on March 5, 2009, and that during one of those conversations, Mr. Waldrop made a telephone call to the defendant in the presence of Agent Guy and other officers. Agent Guy stated that the telephone call transcribed by the defendant and exhibited to the hearing appeared to be the call that was made in Agent Guy's presence.

Detective Brannon listened to the recorded call presented by the defendant at the hearing and opined that it was "a jail call." Detective Brannon testified that he was aware of other telephone calls made by Mr. Waldrop to the defendant from the jail and that he had "listened to some of them, seeking out, or not only with [the defendant] but with other parties that Mr. Waldrop called, trying to see what Mr. Waldrop was saying." Detective Brannon said that Mr. Waldrop made "no more than two or three" telephone calls to the defendant and that, other than the recording exhibited by the defendant, the calls were not "real informative to anything we could have used . . . . in any form or fashion in a proceeding." Detective

Brannon testified that he "trapped" all of the telephone calls made by Mr. Waldrop to the defendant but only downloaded the single conversation exhibited to the hearing by the defendant. Detective Brannon explained how the recording system worked:

> The system at the time was based on a target number, as an example, [the defendant's] – and I don't recall what his number is – being dialed from the jail. It's a computer system. If we entered a target number, then anytime a call was placed to that number, it listed it, and we could look and we could search, A, B, C, one, two, three being a number, and then we could pull those calls and listen to them on the system. We didn't have to download them or copy them or record them to listen to them. If it was thought that there was any significance, they could be recorded; in other words, transferred to a disc or a file.

He said that at the time the calls were made, data storage limitations within the system made it impossible to retrieve calls more than 30-60 days old. He reiterated that none of the recordings he listened to was "of significance that would indicate one way or the other."

The trial court ruled that, based upon the evidence presented, the defendant had failed to establish that the recorded telephone calls would have been material or exculpatory. The court also determined that the same evidence could be available by calling Mr. Waldrop as a witness. The court emphasized that the recorded conversations were not made at the behest of the State. The court found that any negligence present was "of minimal sort" and that the defendant was not entitled to any remedy. In its written order denying the motion to dismiss, the court found:

> (1) it cannot be determined from the proof presented that the content of the material in question is exculpatory nor that the same would be material to the defense at trial; (2) the State did not have exclusive control of the content of the conversations as they were initiated by a potential co-defendant, Eric Waldrop, and accepted as collect calls by this defendant when he had a choice not to do so; and, (3) there has been no showing that the State, in any of its entities, was grossly negligent in the handling of this evidence in light of the testimony of how the telephone monitoring system worked at the time at issue in this cause.

The court reserved "until hearing the proof at trial" a ruling on "whether other remedies, such as curative instructions, might be appropriate."

Although not explicitly stated as such, the trial court's ruling that the defendant had failed to establish that the evidence was material or exculpatory equates to a finding that the State had no duty to preserve the evidence. Based upon our de novo review, we conclude that this ruling was correct. The defendant presented evidence at the hearing that he told officers that Mr. Waldrop had telephoned him at least once while Mr. Waldrop was incarcerated in the Monroe County Jail. Detective Brannon testified that he listened to recordings of "no more than two or three" telephone calls between the defendant and Mr. Waldrop and deemed only one of sufficient significance to warrant its transfer to a disc. The defendant presented no proof to suggest otherwise. Notably, the defendant did not tell officers that he and Mr. Waldrop had discussed the facts of the case or that the telephone calls might, in any way, exonerate him. Additionally, the defendant, by having participated in the conversations, was in a position to know their potentially exculpatory value; yet, he did not testify at the hearing or at the trial that the conversations contained any exculpatory material. Finally, we note that the recording that was preserved and exhibited to the hearing was not exculpatory, making it unlikely that the remaining calls "potentially possessed exculpatory material." Because the defendant failed to establish that the recordings contained potentially exculpatory material, the defendant has failed to establish that the recordings were "constitutionally material" such that the State was under a duty to preserve them. In consequence, the trial court properly denied the defendant's motion to dismiss the indictment.

## II. Sufficiency

The defendant next contends that the evidence was insufficient to support his convictions because the State failed to establish the cause of the victim's death. The State asserts that the evidence was sufficient.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

-10-

Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant was convicted of facilitating and being an accessory after the fact to second degree murder. As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). Code section 39-11-403 "applies to a person who facilitates criminal conduct of another by knowingly furnishing substantial assistance to the perpetrator of a felony, but who lacks the intent to promote or assist in, or benefit from, the felony's commission." *Id.*, Advisory Comm'n Comments. As is applicable in this case,

> [a] person is an accessory after the fact who, after the commission of a felony, with knowledge or reasonable ground to believe that the offender has committed the felony, and with the intent to hinder the arrest, trial, conviction or punishment of the offender . . . [p]rovides or aids in providing the offender with any means of avoiding arrest, trial, conviction or punishment.

T.C.A. § 39-11-411(a)(2).

Here, the evidence, viewed in the light most favorable to the State, established that Mr. Waldrop telephoned the defendant a few days prior to the offense and asked the defendant to provide him transportation so that Mr. Waldrop could "do a job," which the defendant understood to mean that Mr. Waldrop planned to commit a murder. According to the defendant's statement, Mr. Waldrop told him, "'I'm gonna go over there, and I'm gonna kill somebody.'" Mr. Waldrop told the defendant that Mr. Waldrop would earn $3,000 for committing the murder and that he would, in turn, pay the defendant $1,000 for his providing transportation. The defendant picked Mr. Waldrop up at Mr. Waldrop's house. The defendant conceded that Mr. Waldrop was armed with a handgun and that Mr. Waldrop checked to make sure that the handgun was loaded as they drove. The defendant admitted to officers that the two men listened to music deemed by the defendant "murder music" and that Mr. Waldrop told the defendant that he had been "jacked up" to perform the killing for hours. Importantly, the defendant acknowledged to officers that he believed Mr. Waldrop was going to kill the victim, saying, "If I actually had to tell you, I wondered if he wasn't gonna go kill Joanny's mom." The defendant said, "He'd talked about it before. . . . He had

-11-

joked about it, or I guess it wasn't joking now, you know, 'I hate that b[****]. Me and her don't get along anyway. One of these days I'll probably end up killing her.'" The defendant dropped Mr. Waldrop off in Madisonville and then picked Mr. Waldrop up on the shoulder of a "side road . . . right next to the main road" in Etowah three hours later, a length of time the two men had previously agreed upon. That side road, the defendant said, was "just across the train tracks" and over a bridge on the "main road" from Etowah toward Tellico. When the defendant picked Mr. Waldrop up, Mr. Waldrop indicated that he had, in fact, murdered the victim. Despite this admission, the defendant drove Mr. Waldrop to three different banks in Etowah, Englewood, and Madisonville in an attempt to cash forged checks drawn on the victim's account. When their attempts to steal money from the victim's account were unsuccessful, the two men traveled to the defendant's residence, where the defendant, at the very least, provided Mr. Waldrop with lighter fluid and a location to burn the victim's red handbag. Later that same day, the victim's body was discovered inside her abandoned car on a "forest service access type road" that was only "a couple hundred yards out Mecca Pike," which was near the point where the defendant had picked Mr. Waldrop up. The condition of her body made it immediately apparent that she "had been the victim of a violent crime." The defendant, in his statement to police, said that Mr. Waldrop acknowledged that he shot the victim. Finally, Mr. Waldrop acknowledged that he murdered the victim by pleading guilty to second degree murder for his role in her death.

In our view, these facts sufficiently establish that the defendant knew that Mr. Waldrop intended to murder the victim and that he provided Mr. Waldrop with substantial assistance, in this case transportation, in the commission of that offense. Additionally, the facts establish that the defendant aided Mr. Waldrop, who had pleaded guilty to second degree murder before the defendant's trial, in the destruction of the victim's property to help him avoid getting caught. Although the defendant, at various times in his pretrial statements and during his testimony at trial, claimed ignorance with regard to Mr. Waldrop's true plans and claimed to believe that Mr. Waldrop was merely joking about murdering the victim, the jury was "'free to accept or reject any part" of the defendant's rendition of events "'under elementary rules for considering evidence.'" *State v. Charles Brandon Hanner*, No. M2005-01944-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Nashville, June 8, 2006) (quoting *State v. Roger W. Teague*, No. 85-210-III, slip op. at 3 (Tenn. Crim. App., Nashville, August 19, 1986)). Moreover, the State need not prove a specific cause of death to support a conviction of second degree murder under Code section 39-13-210(a) and need only prove "that death was not occasioned by natural causes, by accident, or by the deceased in person." *State v. Shepherd*, 902 S.W.2d 895, 901 (Tenn. 1995) (citing *Davis v. State*, 445 S.W.2d 933, 935 (Tenn. 1969)). In sum, the evidence was sufficient to support both of the defendant's convictions.

-12-

## III. Sentencing

In his final claim, the defendant contends that the trial court erred by imposing a fully-incarcerative sentence. The State contends that the record supports the sentencing decision of the trial court.

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

The supreme court expanded the holding in *Bise* to the trial court's decision regarding alternative sentencing and probation eligibility in *State v. Caudle*, ruling "that the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

At the sentencing hearing, Danny Isbill, who prepared the presentence report in this case, testified that the defendant had no criminal history and that he had complied with the terms of his release on bond. The victim's husband testified that the victim left behind nine children, six of whom were under the age of 13.

The defendant's mother and father testified that it was their belief that the defendant had been wrongfully convicted and that they believed that the defendant could and

would abide by the terms of a probationary sentence. The defendant's uncle, a pastor who also employed the defendant as an assistant pastor, testified that he, too, believed that the defendant had been wrongfully convicted. He said that he had concluded, without having heard any of the proof presented during the defendant's trial, that the defendant was an innocent man who had been made a victim of a corrupt court system. A pastor friend of the defendant's testified that the defendant "deserve[d]" a sentence of full probation.

The defendant testified and again disavowed any knowledge of Mr. Waldrop's plan to murder the victim. He claimed, as he did at trial, that he had been bullied by police into providing fabricated details that implicated him in the crime. He said that if he had had "any inclination of knowing anything [Mr. Waldrop] was planning that day," he would not have agreed to meet Mr. Waldrop. The defendant agreed to comply with any condition of probation.

Martha Cook, Monroe County Circuit Court Clerk, testified that there were 33 homicides in Monroe County, five in Polk County, six in McMinn County, and four in Bradley County, for a total of 48 homicides within the judicial district.

At the conclusion of the hearing, the trial court took judicial notice of census data that established that the population of Monroe County did not account for more than 25 percent of the population the judicial district. The court observed that despite its relatively small size, Monroe County had more than double the homicides than the entire rest of the district combined. The trial court also noted that the defendant had failed to accept any responsibility for his role in the offenses and that the letters filed on behalf of the defendant "tend to blame everybody except the perpetrators of the offense." The court concluded that no mitigating or enhancement factors applied in this case. Based upon these conclusions, the trial court imposed a sentence of eight years for the defendant's conviction of facilitation of second degree murder and one year for his conviction of being an accessory after the fact. The court ordered the sentences to be served concurrently, for a total effective sentence of eight years.

Regarding the manner of service of the sentence, the trial court determined that confinement was necessary to avoid depreciating the seriousness of the offense. *See* T.C.A. § 40-35-103(1)(B). The court observed that the victim's murder was "one of the most senseless killings [it had] ever seen in . . . my whole tenure on the bench." The court noted that the defendant's actions "contributed to the senseless death of this totally, totally innocent lady." The trial court also determined that confinement was necessary as a deterrent. *See id.* (permitting a fully incarcerative sentence where "confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses"). The court again observed that more homicides were committed in Monroe County than the entire rest of the

district combined, and it concluded that imposition of a fully incarcerative sentence in this case would operate as a deterrent to future homicides.

In our view, the record fully supports the sentencing decision of the trial court. The testimony of the defendant and the witnesses on his behalf reflect a total disregard for the seriousness of the offense and a complete failure to accept responsibility for the defendant's role in it. Nothing in the record suggests that the victim's murder was anything other than a completely senseless and unprovoked killing, and, as discussed above, the proof clearly established that the defendant provided substantial assistance to Mr. Waldrop both before and after the murder with full knowledge that Mr. Waldrop would kill or had killed the victim. The defendant is not entitled to relief on this issue.

*Conclusion*

Because the defendant failed to establish that the audio recordings of telephone calls made to the defendant by Mr. Waldrop were "constitutionally material," the trial court did not err by refusing to dismiss the indictment. The evidence was sufficient to support both of the defendant's convictions, and the trial court did not err by imposing a fully incarcerative sentence. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-15-